Filed 7/28/26  In re J.W. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>Christina M.,<br><br>    Defendant and Appellant. | A174019, A174458<br><br>(Alameda County<br>Super. Ct. No. JD037528-01) |

The juvenile court ordered that appellant Christina M. (Mother) have visitation with her son after he was removed from her care, but respondent Alameda County Social Services Agency (Agency) was never able to provide it for a variety of reasons that the court eventually found to be legitimate.  In these consolidated appeals, Mother challenges orders finding that she was provided with reasonable reunification services despite the lack of visitation.  She also argues that the juvenile court and Agency did not fully comply with the inquiry provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq., ICWA).  We reject Mother's arguments and affirm.

1

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

Social services agencies in three Bay Area counties have intervened in the lives of Mother's children. The minor was the subject of juvenile dependency proceedings in one of those counties (not Alameda) when he was five years old. Apparently during those proceedings, the minor's father reported that he did not have Native American ancestry. The dependency proceedings in that separate county were ultimately dismissed in July 2022, and the minor was placed with his father, with visitation rights granted to Mother. The minor's father died later that year, and the minor was returned to Mother's custody. Also in 2022, Mother had another child with a different father, and that man became a father figure to the minor.

The minor has been diagnosed with autism spectrum disorder, and he has an individualized education plan in place to meet his educational needs.

These current proceedings began after the Agency in April 2024 received reports that the then six-year-old minor and two younger half siblings had tested positive for marijuana and Mother had no explanation for how the children ingested the drug. One of the younger siblings also reportedly ingested fentanyl and was admitted to the hospital to be given Narcan (naloxone). Mother was arrested at night while in bed with the minor, and he later said he felt she abandoned him because, according to him, "[s]he was sleeping with me that night and then she was gone." Further investigation revealed small amounts of marijuana and ammunition in Mother's home. Mother was jailed after her arrest on child-abuse related charges and possession of ammunition. She was five months pregnant at the time.

The social worker interviewed Mother about possible Native American ancestry, and Mother gave the worker no reason to believe the minor was an Indian child under ICWA.

The Agency in May 2024 filed a juvenile dependency petition (Welf. & Inst. Code, § 300)[1] alleging that the minor was a child described by section 300, subdivision (b) (failure to protect) because of his ingestion of marijuana and also because of Mother's arrest. Attached to the petition was an ICWA-010(A) form indicating there was no reason to believe the minor was an Indian child.

The minor was present at the detention hearing. He apparently had been upset in the hallway before the hearing, but the trial court coaxed him into the courtroom with Pokémon cards, and the court held the hearing while "off the bench just to . . . make [the minor] more comfortable." The trial court told the minor that the social worker would take him to get more Pokémon cards after the hearing, apparently because the court was concerned how the minor would handle the transition to a new caregiver. The minor was ordered detained, with visitation ordered between him and Mother "as frequently as possible consistent with [the minor's] well-being." For reasons that will become apparent, no visitation ever occurred.

The minor was placed with the relatives of the minor's half sibling (i.e., a non-relative extended family member).[2] Although the woman who cared for the minor throughout much of the proceedings is not related to the minor, we refer to her as the Foster Grandmother. Her home could not be approved on an emergency basis for a longer placement, so the minor was soon placed

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] The minor's half sibling was placed with her father, and apparently dependency proceedings were not initiated on her behalf.

3

with another foster family.  The minor had overnight weekend visits with the Foster Grandmother while her home underwent the approval process for placement.

The social worker interviewed the paternal grandmother and paternal great-grandmother in May 2024 about possible Indian ancestry.  The grandmother said she had Native American ancestry on her mother's side but was not aware of the tribe, and the paternal great-grandmother said she had Cherokee ancestry on her father's side of the family.  Later that month, the Agency mailed ICWA notice of the proceedings to the Sacramento regional director of the Bureau of Indian Affairs as well as to three addresses connected to the Cherokee Nation.  The ICWA-030 form listed the names of Mother, the minor's father, the maternal grandparents, the paternal grandmother, a paternal great-grandmother, and a paternal great-grandfather.  The form indicated that the minor's father may have been connected to various bands of the Cherokee Nation.  The Agency received responses stating that the minor was not registered or eligible to be registered as a member in two of those bands, and the other band did not respond.

A jurisdiction/disposition report dated May 2024 stated that there was a criminal protective order in effect preventing Mother from having contact with the minor.  The report stated that if the order was amended to make exceptions for visitation, the Agency recommended that Mother receive two hours of weekly supervised visitation.

At a hearing in early May 2024, Mother testified under oath about possible Native American ancestry.  She testified that she was not aware of any Native American ancestry in her family, and that there was "no Native American [ancestry] at all" on the father's side, either, based on a previous

4

dependency proceeding in Solano County. By the time of the hearing, there was a carve-out to the protective order in place, so Mother was permitted visitation with the minor. At the end of the hearing, the juvenile court ordered that Mother receive visitation, supervised by a non-family member.

At an uncontested hearing in June 2024, Mother submitted to the allegations of the petition, and the juvenile court found the petition's allegations to be true and adjudged the minor a dependent child. The court ordered that reunification services be provided to Mother. It further ordered that the Agency arrange for supervised visitation as frequently as possible, consistent with the minor's well-being. Around this time, the minor was placed with the Foster Grandmother.

Mother in July 2024 requested an ex parte hearing because she had not had any visits with the minor, apparently because the minor said he did not want to visit with Mother and refused to get in the car when it was time to be transported to visits. Her pleading stated that the Agency had requested therapeutic visitation in order to work through the minor's feelings of abandonment, but Mother objected to the heightened level of supervision. She instead requested that the court permit a person known to the family to provide supervision, preferably at a public library.

At the hearing on the request, Mother's counsel reported that Mother was in the hospital, possibly in early labor. The juvenile court reported communicating with the judge overseeing Mother's criminal case. Mother reportedly was not in compliance with a condition of her release that she participate in out-patient treatment because she said her doctor ordered her to be on bedrest. The juvenile court was concerned that Mother's request in this case for in-person supervised visitation (and a related request for transportation) conflicted with her representations in her criminal case that

5

she could not comply with the conditions of her release because she was confined to bed.

The juvenile court ultimately ordered that Mother receive therapeutic visitation with the minor. The court was aware that visitation could not be prevented "just . . . based upon the fact that the child says, 'no.' " But having previously interacted with the minor, the juvenile court was "very sensitive to the need to be careful with him and not disruptive with him," and considered therapeutic visitation to be appropriate. The court also observed that "I think professionals need to be involved, because of the information that I have, and my own personal experience with this child." County counsel represented that a therapist had been identified at a visitation center, but that counsel did not know an orientation date.

The minor continued to refuse visits with Mother. The social worker checked with the minor in July and August 2024, but the minor continued to say he did not want visits. The worker suggested options such as having the minor's caretaker present during visits, or holding video or phone visits, but the minor refused.

The minor began therapy in August 2024. Around this time, the minor disclosed sexual abuse by Mother, and the following month he reported abuse to a different person. Mother adamantly denied the allegations. She acknowledged that she had work to do on her parenting skills, but said she had never committed sexual abuse. She reported that the Foster Grandmother's daughter had been sexually abused and said the minor may have overheard a conversation about it. Mother later testified that she laughed when she first learned of the allegations "[b]ecause it threw me for a loop, one, and two, I knew it wasn't true, and that was my reaction, I chuckled." She believed the Foster Grandmother had coached the minor

6

because, in Mother's words, "One, I know my child. [¶] Two, my child went from, from wanting to see me to, felt abandoned, to now this. The pattern does not add up, and I had a close relationship with my child." The social worker who visited with the minor during his placement with the Foster Grandmother did not share concerns about coaching.

In September, the Agency sought an order suspending required visits since, according to the Agency, the visits were detrimental at that time. Mother opposed the request. The minute order entered following the October hearing on the request states, "Present order is continued except as modified herein."

Meanwhile, Mother gave birth in August 2024 and lived in Oakland with her baby. In September she was referred to a substance-prevention program, where she attended most of her relapse-prevention classes and weekly counseling sessions. She also tested negative twice each week for alcohol and drugs.

The minor described the sexual abuse allegations against Mother during a November 2024 forensic interview that was videorecorded. Two social workers found the minor to be credible, and one later testified that she was not concerned that the Foster Grandmother might be coaching the minor. The Agency filed a supplemental petition (§ 342) that included the sexual-abuse allegations.

The Agency recommended before the six-month review hearing that reunification services continue for Mother and that the minor continue in out-of-home placement. No visits had occurred. When visitation was raised with the minor, he would become anxious, ask if he would be returning to Mother, run to his room, and increase aggression and bed wetting. He told the social worker that he wanted to stay with the Foster Grandmother.

7

At a hearing in November 2024, Mother's counsel expressed concern that the Foster Grandmother was possibly coaching the minor. Counsel also was concerned about the minor continuing in the Foster Grandmother's home because of her criminal background, as well as the criminal background of a man who was living in the same home. The minor was present at the hearing, and his attorney reported that it was "important to [the minor] for me to share with you that he does not want to go with his mother, and he does want to stay in the home of" the Foster Grandmother. Based on the new sexual-abuse allegations, the juvenile court found that no visitation should occur because visits would be detrimental to the minor's well-being.

The parties returned to court in December 2024 after the minor's counsel filed an objection to the Agency's plan to remove the minor from the Foster Grandmother's care because her home could not be approved for a permanent placement. The minor was again present at the hearing, and he told the juvenile court he did not want to leave the Foster Grandmother's care. The court ordered that the minor not be moved before early January. The court also ordered that the Agency have discretion to begin supervised visitation with Mother if the Agency provided three court days' advance notice before that discretion was exercised.

Two people (a man and a woman) who reported they were Mother's second cousins were present at a hearing in January 2025. The juvenile court asked both of them if they had any Native American ancestry. One reported that he did not. When the juvenile court asked the woman how she was related to mother, the man interjected, "That is through me, she [the woman] is married to me and I'm her [presumably, Mother's] cousin." The woman reported that she had Native American ancestry through the "Chato" tribe. After county counsel clarified that it did not appear that the woman

8

was Mother's blood relative, the juvenile court did not question her further. The juvenile court found that ICWA did not apply.

County counsel stated that the Agency recommended that the minor be placed with a relative of the Foster Grandmother (apparently a cousin of hers). Mother's counsel objected to the placement and continued to express concerns that the Foster Grandmother was "maybe coaching the minor into picking this now substitute care provider." The juvenile court adopted the Agency's recommendation and ordered the minor placed with the new caretaker within two to five weeks.[3] The Agency later learned that the new caregiver used the Foster Grandmother "for excessive child care," and the Foster Grandmother continued to have extended unsupervised contact with the minor.

The minor continued to tell the social worker that he did not want to visit with Mother. According to the social worker, the minor "says his mom is mean and doesn't want to talk or see her." The minor's therapist reported that the minor was not yet ready for visitation to begin.

In the first few months of 2025, Mother attended five out of 11 scheduled relapse-prevention sessions, but she did not show for the rest. She also attended one parenting-education class and two out of nine scheduled counseling sessions. Of 26 scheduled drug tests for Mother, she tested negative three times and positive for marijuana 13 times, and she did not show 10 times. During this period Mother reportedly said she "wanted to give up" on the minor since she did not believe she would be able to reunify, but "after giving it more thought, she said that she would like to try again."

---

[3] Mother appealed from the placement order but later abandoned her appeal. This court granted Mother's request in these appeals to take judicial notice of the record in her prior appeal (No. A172371).

The videorecording of the forensic interview with the minor was played at an April 2025 hearing regarding the supplemental petition (§ 342). Two social workers testified about their investigation. One of the workers also testified that Mother was only "minimally in compliance" with her case plan because she did not appear for all scheduled drug tests, and she tested positive for marijuana on some of the occasions when she did test. Mother had "minimal attendance" at counseling sessions and also "[m]inimally" attended her relapse-prevention program, according to the social worker. The Agency continued to recommend that Mother receive six additional months of services.

Mother also testified at the April 2025 hearing. When asked why the minor might not want to visit with her, she testified, "Multiple reasons. The main reason is he is comfortable with how he gets treated with [Foster Grandmother's] babies, she gives him whatever he wants. He feeds off of that. [¶] Also, my house wasn't the best, I can admit to that, so he is kind of like probably thinking that it's going to be the same way when . . . he comes back, or if he comes back." She considered it odd that the minor did not want to visit with her and had trouble believing it. Mother explained that the minor was "declining people that he has had a relationship with on a[n] every day basis, and he is saying he doesn't know those people. So to me it's odd, and I don't believe everything that he is saying right now."

The juvenile court was concerned whether there was a sufficient indicia of reliability regarding the allegations in the supplemental petition, and it concluded that the allegations had not been proven by a preponderance of the evidence. As for the petition that had already been sustained, the court treated the hearing as a six-month review hearing and concluded that out-of-home care continued to be appropriate and that reasonable services had been

10

provided to Mother. The court ordered that Mother be provided with an additional six months of services. And the court also ordered that supervised therapeutic visitation occur "as frequently a[s] possible consistent with the child's well-being." The court acknowledged that the minor's therapist had reported that the minor was not ready for visitation to begin, but the court stated that "I want folks to be mindful that the goal is to facilitate any[]way in which visitation can be achieved." And the court was clear that "[t]he child clearly cannot just simply be asked, do you want to visit with your mom. [¶] And there is case law to that effect that that is not sufficient." Mother appealed from the order entered after the hearing, and this is the subject of appeal No. A174019.

The Agency received reports that the minor witnessed a domestic-violence incident while visiting the Foster Grandmother's home in May 2025 (though the Foster Grandmother later said the minor was not present during the dispute). The Agency requested that the minor be permitted only supervised visitation with her. The minor's caretaker then stated her work schedule prevented her from providing long-term care for the minor, since she had been relying on the Foster Grandmother's help. The Agency removed the minor from his placement, and he was placed in shelter foster care, then later with a foster family.

The Agency recommended in June 2025 that Mother receive an additional six months of reunification services. The minor had not yet visited with Mother and continued to say he did not want to see her. At a hearing around this time, county counsel reported that arrangements were being made to begin therapeutic visitation. Counsel acknowledged, though, that "if [the minor] refuses to get in the car clearly we cannot force him, we cannot put hands on him but we need to try and that's where we are." The juvenile

11

court stated that "we need to at least make sure we are doing the—or expending the effort to facilitate [visitation] in any way we can," including "involv[ing] or brainstorm[ing] with the [minor's] therapist or counselors to suggest a way to accomplish that visitation."

The minor's therapist did not believe that the minor was ready to begin visits with Mother—even over the phone—because meeting with Mother against his wishes would harm the therapeutic relationship and destabilize his current placement. The therapist also was concerned that the minor was "a flight risk and that forced in person contact with his mother would jeopardize his mental and physical safety."[4] The minor also refused phone calls with Mother. After the minor's counsel requested that visitation be suspended, the juvenile court issued an order in July 2025 stating that visitation with Mother was detrimental to the minor and was suspended pending further court order.

Mother continued to attend relapse-prevention classes (though she was a no show for two sessions in June 2025), and she was either a no show or tested positive for marijuana in June and July. The Agency recommended in August 2025 that Mother's reunification services be terminated, that the minor remain a dependent of the court, and that the court not set a selection-and-implementation hearing (§ 366.26) because no permanent plan had been identified.

The juvenile court held a 12-month hearing in August 2025. A child welfare supervisor in the Agency's family-reunification unit testified and acknowledged that Mother had expressed concern that the Foster

---

[4] The reference to being a flight risk likely is a reference to an incident when the minor ran away (either while in a Walmart or to a Walmart) and was missing "for several hours" after his caregiver told him he would have a visit with Mother.

Grandmother had "coached" the minor to not want to see Mother. Mother's counsel examined the supervisor extensively about whether the minor could be placed with the paternal grandmother. When asked by county counsel what the Agency had done to facilitate visitation, the supervisor testified that the Agency had reached out "many, many times" to the minor's therapist for updates on his progress. The Agency also made a referral to a visitation center, and the minor's counsel made herself available for scheduled visits. But the minor "was not willing to get in the car to go to those visits and the therapist has continued to share that at this time she does not recommend that [the minor] have in-person visitation. That when it is brought up he regresses, becomes very upset, agitated, shuts down. I had expressed an interest in at least trying to . . . start a phone call or a video, maybe having somebody that [the minor] feels more comfortable with sitting in on that phone call or video and he is refusing to do that and the therapist is also saying that they don't believe it's a good time for him to try to start doing that." The minor's caregiver reported it was "very scary" when the minor ran away for two hours after being told about a possible visit, and the supervisor said "[t]he amount of anxiety [the minor] was demonstrating in just being told that he had a visit did not feel helpful for his mental health." According to the supervisor, even discussing Mother upset the minor, and she (the supervisor) did not believe there was anything else the Agency could have done to get the minor to visit with Mother.

As for Mother's compliance with her case plan, the supervisor was concerned about the lack of attendance in her relapse-prevention program as well as Mother testing positive for marijuana. Mother also testified at the hearing.

13

Counsel for the Agency and the minor both asked that Mother's reunification services be terminated. Mother's counsel, by contrast, argued that Mother had "been robbed of her fundamental rights to maintain the parent-child bond with [her son], to regain her ability to care, custody and companionship of [the minor]." And she continued to maintain that the Foster Grandmother had coached the minor to not want contact with Mother. Counsel argued that Mother had not received reasonable services and that services should be extended for an additional six months.

The juvenile court found that the Agency had provided reasonable services and had done its best to facilitate visitation. The court acknowledged the importance of visitation and the fact "that parents should be afforded visitation if at all possible, but not to the detriment of the child." The court also stated that it could not, "after reading the input of the [minor's] therapist, which instructs and implores, that it would be detrimental. It's not—it really is not in any way equivocal. It's very clear that it would—that The Court could not do anything else but what it has done" (a reference to its previous findings that visitation would be detrimental to the minor). The court also said it was concerned that Mother continued to test positive for marijuana since "that's part of the petition." The court terminated reunification services since, based on "the totality of the circumstances and the evidence," the court found that termination was in the best interests of the minor. And it found by a preponderance of the evidence that returning the minor to Mother would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being. The court did not schedule a selection-and-implementation plan since the minor was not a proper subject for adoption and no one had been identified to

14

become the child's legal guardian.  Mother appealed, and this is the subject of No. A174458.

This court granted Mother's request to consolidate her two appeals.

## II.
### DISCUSSION

*A. Although No Visitation Occurred, Mother Has Not Identified Reversible Error Related to the Reunification Services She Received.*

Mother argues both that the juvenile court's visitation orders were insufficiently specific and that she did not receive reasonable reunification services because she was denied visitation with her son.  For the reasons that follow, we affirm the juvenile court's orders.

At both a six-month and 12-month review hearing, if a dependent minor is not returned to parental custody, the juvenile court shall determine by clear and convincing evidence whether reasonable services that were designed to aid a parent to overcome the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent.  (§§ 366.21, subd. (e)(8) [6-month review] & 366.21, subd. (f)(1)(A) [12-month review].)  "The adequacy of reunification plans and the reasonableness of [the Agency's] efforts are judged according to the circumstances of each case.  [Citation.]  Moreover, [the Agency] must make a good faith effort to develop and implement a family reunification plan.  [Citation.]  '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.)

15

Reunification plans must include visitation between parent and child that "shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1).) "Visitation is an essential component of any reunification plan." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) But "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).)

We review a finding of reasonable services for substantial evidence. (*Amanda H. v. Superior Court, supra*, 166 Cal.App.4th at p. 1346.) Under this standard, we determine whether there is substantial evidence, contradicted or uncontradicted, to support the conclusion of the trier of fact. (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 674.) " 'Even if there is no substantial conflict in the evidence, we must nevertheless draw all legitimate inferences in support of the findings of the juvenile court.' " (*Ibid.*)

Mother first argues that the juvenile court improperly delegated the determination of whether visitation would occur to the minor, his therapist, and the Agency. We acknowledge that Mother consistently maintained below—and the Agency vigorously disputed—that caregivers influenced the minor, who has special needs, to resist visitation. One version of the evidence presented was that the minor was traumatized after Mother was taken from their shared bed when she was arrested during the night, felt troubled by events he did not understand, and was influenced—either intentionally or inadvertently—to decline visits. But the juvenile court, who repeatedly interacted with both Mother and her son, was presented with substantial evidence that no coaching occurred and that the Agency did all it could to facilitate visitation.

Mother recounts the history of the Agency's (ultimately unsuccessful) efforts to arrange visitation by plucking language from various minute orders

16

and argues why the orders fell short (despite not objecting below to the language). In her telling, the Agency was ordered to provide visits as frequently as possible throughout the reunification period, with the exception of brief periods when visits were found to be detrimental. But she omits context for some of the orders she points to. For example, she claims that the juvenile court's visitation order in effect between December 12, 2024, and May 16, 2025, was "vague" because "whether to allow visitation or not was completely at the discretion of the Agency." Mother is referring to a minute order that states, "The Agency has discretion to start supervised visits with the mother, the Agency is to provide 3 court days advance notice prior to discretion being exercised." She omits the context that the order was entered around the time that sexual-abuse allegations had been raised. Although the allegations were not ultimately sustained, it was a time period where mandatory visits were not realistic, especially given the minor's consistent statements that he did not want visits with Mother.

Mother relies heavily on *In re S.H.* (2003) 111 Cal.App.4th 310, which held that "[w]hen the court abdicates its discretion . . . and permits a third party, whether social worker, therapist or the child, to determine whether any visitation will occur, the court violates the separation of power doctrine." (*Id.* at pp. 317–318, fn. omitted.) We recognize that visitation is an essential part of a reunification plan and that the juvenile court must do everything to ensure that such visitation is provided consistent with the minor's wellbeing. The juvenile court here consistently made it clear that it was aware of this obligation. The court stressed throughout the proceedings that visitation was crucial to reunification, that every effort should be made to facilitate such visitation, and that the minor could not have veto power over visits. As the court noted at the hearing when it terminated reunification services, "I find

17

that the minor . . . consistently refused visitation.  It's more than consistently.  He hasn't wanted visitation at all.  I've tried to find ways of trying to work around this.  I think everybody has tried to find ways of working around this.  This is a constant conversation that we have had.  I think the Agency has tried to consider specifically his specific ways to try and facilitate that based upon the minor that they have.  And it's unlikely—I don't see that the minor's resisting those efforts is really about to change any[]time soon.  I can't see that.  And extension [of services] would only cause a further delaying of the permanency, which is something that is required."

The court was well aware that it "clearly doesn't co-sign or rubber stamp what the minor wants.  And it's not just that The Court is responding to a petulant child who just wants what he wants and The Court goes along with it.  The Court is considering his experience, his observations with the child, all the things that I have read about the child, and I have to focus on the child's best interests."  "[I]t is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent.  Trial judges are not mental health experts, nor child behavior experts.  As one court noted, '[D]ependency courts "simply do not have the time and resources to constantly fine tune an order in response to the progress or lack thereof in the visitation arrangement, or in reaction to physical or psychological conduct which may threaten the child's well-being." ' "  (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046.)

Mother separately argues that she did not receive reasonable reunification services.  Her arguments all focus on the lack of visitation: that the Agency allegedly failed to take steps to implement visitation orders, that the court and Agency supposedly did not take adequate steps to find out why the minor refused visits or what could be done to change his hesitancy over

18

visits. We are certainly sympathetic, as was the juvenile court, to Mother's concerns that efforts to facilitate visitation were unsuccessful. But we disagree with her contention that the visitation orders issued during the reunification period were "illusory," as she argues on appeal, or that the Agency and juvenile court did not adequately try to arrange for such visitation. We conclude that she has not identified reversible error.

*B. Sufficient Evidence Supports the Finding that ICWA Does Not Apply.*

Mother next argues that the Agency and the juvenile court failed to conduct an adequate inquiry under ICWA and state law as to whether the minor is or may be an Indian child. She is mistaken.

"ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes and does not prohibit states from establishing higher standards." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1129.) "Section 224.2 codifies and expands on ICWA's duty of inquiry to determine whether a child is an Indian child. Agencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child. (§ 224.2, subd. (a).) This 'duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.' " (*Id.* at pp. 1131–1132, fn. omitted.)

Mother identifies two situations where she contends the juvenile court's inquiry efforts fell short. She first points to the January 2025 hearing where the court first questioned Mother's second cousin, then that cousin's wife, about Native American ancestry. Although the wife said she had a connection to the Chato tribe, the juvenile court stopped questioning her after

19

both the second cousin and county counsel clarified that the wife was not a blood relative. Mother faults the court for not asking for clarification about whether the wife was a second cousin or the second cousin's wife, but we find no ambiguity. The second cousin told the court that "she is married to me and I'm her [Mother's] cousin." On appeal, Mother faults the juvenile court for not seeking further clarification from the second cousin's wife, but notably—*no one disagreed* with county counsel's observation that the wife was not a blood relative.

Mother also faults the Agency for not asking about the Native Ancestry of a woman named K., described in one status report as a "family friend[]," since that woman was described in a later report as a "sister." The later report stated: "[Mother] shared that her cousin J[.] and M[.] continue to support her in need. Her sister K[.] helps her with her son when needed." It could be that K. was the sister of *M.* (the wife of the second cousin described above). Elsewhere in the record, Mother reported that she did not have a relationship with her siblings and instead she "stated it [was] best for her to stay away from her birth family and remain connected with her chosen family who support her." Mother elsewhere described K. and another woman as "like family members to her."

"[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review. [Citations.] ' "On a well-developed record, the court has relatively broad discretion to determine whether the [social-service] agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case." ' " (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.) Viewing the well-developed record as a whole, the juvenile court properly concluded that an adequate inquiry had been made of

Mother's known family members, and that based on that inquiry, ICWA did not apply.

Mother compares this case to *In re S.S.* (2023) 90 Cal.App.5th 694, where the court conditionally reversed a finding that ICWA did not apply and directed the social-services agency to conduct further inquiry. (*Id.* at p. 712.) Unlike here, though, the agency in *S.S.* never asked three paternal extended family members about possible Indian ancestry even though the relatives were known to the agency. (*Id.* at p. 697.) The record here shows that the court and the Agency asked all known family members (as opposed to non-family members who were so supportive they were considered "like family") about potential Indian ancestry. Sufficient evidence supports the juvenile court's ICWA finding.

### III.
#### DISPOSITION

In A174019, the juvenile court's April 8, 2025 order is affirmed.

In A174458, the juvenile court's August 11, 2025 order is affirmed.

_____

Humes, P. J.

WE CONCUR:

_____

Banke, J.

_____

Langhorne Wilson, J.

*In re J.W.*  A174019, A174458